J-S60016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| C.A.W. | IN THE SUPERIOR COURT OF |
| :--- | :--- |
| v. | PENNSYLVANIA |
| M.K. | |
| APPEAL OF: M.K. | No. 829 MDA 2014 |

Appeal from the Order entered April 15, 2014,
in the Court of Common Pleas of York County,
Civil Division, at Nos: 2009-FC-000526-03

BEFORE: OTT, STABILE, and JENKINS, JJ.

MEMORANDUM BY STABILE, J.: **FILED NOVEMBER 17, 2014**

M.K. (Father) appeals from the order entered April 15, 2014, in the York County Court of Common Pleas, which awarded primary physical custody of his minor child, C.K. (Child), born in April of 2007, to Child's mother, C.A.W. (Mother). The order also granted Father partial physical custody of Child, and granted both parties joint legal custody of Child. Also before us is Mother's Application for Relief. We deny Mother's application and affirm the order of the trial court.

Mother and Father are former spouses. They divorced in 2009 and engaged in a series of custody disputes. This culminated in a custody order entered on December 1, 2011. Since the parties separated, Mother has had primary physical custody of Child, Father has had partial physical custody of Child, and the parties have had shared legal custody of Child.

On July 1, 2013, Mother filed a Petition for Modification of Custody Order. In her petition, Mother requested, *inter alia*, that she be given primary legal custody of Child, and that Father's physical custody be reduced, because of Father's hostility toward Mother, Father's failure to communicate with Mother, and because Mother anticipated that Child would be participating in an increased number of extracurricular activities which required "a more stable schedule and the flexibility of both parents to accommodate the child's best interest." Plaintiff's Petition for Modification of Custody Order, 7/1/13, at 4. On July 12, 2013, Father filed an answer and counterpetition to Mother's petition to modify. In his counterpetition, Father alleged that Mother harasses Father and attempts to alienate Father from Child. Father requested that the court grant equal periods of physical custody. That same day, Father filed a Petition for Contempt against Mother, alleging that she had violated the custody order in a variety of ways. Mother filed an answer to Father's counterpetition on August 5, 2013.

An Interim Order for Custody, Pending Trial, was entered on August 13, 2013. The order did not alter the parties' existing custodial arrangement. On October 15, 2013, Father filed an Amended Answer and Counterpetition to Plaintiff's Petition for Modification of Custody, in which he requested that, in the alternative, he be granted primary physical custody of Child. Mother filed an answer to the amended counterpetition on December 13, 2013.

Father also filed a Petition for Special Relief on December 31, 2013. In the petition, Father alleged that Mother had violated the custody order by leasing a new residence and moving Child to a new school district without consulting with, or informing, Father. Mother filed an answer to Father's petition on January 9, 2014. On January 13, 2014, an order was entered directing that Child be returned to his former school. On January 29, 2014, Mother filed a Petition Seeking Reconsideration of the trial court's order. Father filed a response to Mother's petition on February 4, 2014. Father filed an Amended Petition for Contempt that same day, in which he alleged, *inter alia*, that Mother had failed to file an application to have Child returned to his prior school. Mother filed an answer to Father's amended contempt petition on April 8, 2014.

A custody trial took place on April 10, 2014, and April 11, 2014. The trial court delivered its opinion on April 14, 2014. On April 15, 2014, the court entered a Custody Order After Trial. The custody order granted Mother continued primary custody of Child, with some modifications. The order also granted contempt against Mother for her act of moving Child to a new school district without Father's consent or knowledge, and for failing to reenroll him in his old school. The court also found Mother in contempt for the "histrionics" she displayed during an argument with Father at Child's doctor's office. Custody Order After Trial, 4/15/14, at 16.

On April 24, 2014, Father filed a Motion for Reconsideration of the trial court's order. Mother filed an answer to Father's motion and a Motion to Dismiss Father's motion on May 6, 2014. The trial court entered an order denying Father's motion on May 12, 2014. Father timely filed a notice of appeal on May 13, 2014. Father also filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On May 16, 2014, the trial court issued a statement indicating that the reasons for its decision could be found in its opinion and order entered April 14, 2014, and April 15, 2014, respectively.

Father now raises the following issues.

I. Whether the trial court abused its discretion in granting [Mother] primary physical custody of the parties['] minor child, which decision was against the weight of the evidence presented at trial, and is contrary to the best interest of the child?

> a. Whether the trial court abused its discretion and erred in determining that neither party was more likely than the other to encourage and permit the child to have frequent and continuing contact with the other party, pursuant to 23 Pa. C.S. § 5328(a)(1)?
>
> b. Whether the trial court abused its discretion and erred in determining that both parties, in term[s] of family and community life, have the ability to provide stability and continuity for the child, pursuant to 23 Pa. C.S. § 5328(a)(4)?
>
> c. Whether the trial court abused its discretion and erred in determining Mother has the ability to provide stability and continuity for the child, in the physical sense, pursuant to 23 Pa. C.S. § 5328(a)(4)?

- 4 -

d. Whether the trial court abused its discretion and erred in failing to properly consider the well[-]reasoned preference of the child based on the child's maturity and judgment, pursuant to 23 Pa. C.S. § 5328(a)(7)?

e. Whether the trial court abused its discretion and erred in determining that the parties were equally likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for child's emotional needs, pursuant to 23 Pa. C.S. § 5328(a)(9)?

f. Whether the trial court abused its discretion and erred in determining that the parties were equally likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child, pursuant to 23 Pa. C.S. § 5328(a)(10)?

g. Whether the trial court abused its discretion and erred in determining that the parties were equally able to care for the child, pursuant to 23 Pa. C.S. § 5328(a)(12)?

h. Whether the trial court abused its discretion and erred in failing to properly consider Mother's mental condition pursuant to 23 Pa. C.S. § 5328(a)(15), and failed in giving weigh[t]ed consideration to this factor as it impacts the safety of the child?

i. Whether the trial court erred in giving weight to the child's bond with Mother, which does not affect the safety of the child, over the other factors, in violation[] of 23 Pa. C.S. § 5328?

Father's Brief at 8-10 (suggested answers omitted).

Before considering Father's issues, we note that, on July 25, 2014, Mother filed an Application for Relief in this Court. In her application, Mother argues that Father's brief and reproduced record violate our Rules of Appellate Procedure in numerous ways, contends that Father's appeal should

be dismissed, and requests counsel fees. The substance of Mother's application is repeated in her brief on appeal. Mother's Brief at 27-30. Mother points out, *inter alia*, that Father's brief fails to contain a copy of the trial court's opinion, the order appealed from, Father's concise statement of errors complained of on appeal, or a proof of service, and argues that Father's reproduced record is unnecessarily large, contains handwritten notations, and is out of order. While Mother is correct that Father has failed to submit a brief and reproduced record in perfect compliance with our rules, his errors are relatively minor and do not impede our review. Therefore, we decline to dismiss Father's appeal, and we proceed to review his appeal on the merits. **See Green v. Green**, 69 A.3d 282, 285 n.2 (Pa. Super. 2013) (quoting **White v. Owens–Corning Fiberglas, Corp.**, 668 A.2d 136, 141 (Pa. Super. 1995), *appeal denied*, 683 A.2d 885 (Pa. 1996)) ("'[I]f the failure to comply with the rules of appellate procedure does not impede review of the issues or prejudice the parties, we will address the merits of the appeal.'").

We address Father's claims mindful of our well-settled standard of review.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the

-6-

test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***V.B. v. J.E.B.***, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." ***S.W.D. v. S.A.R.***, 96 A.3d 396 (Pa. Super. 2014) (citation omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a).

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[1]

Instantly, in its opinion of April 14, 2014, the trial court discussed the factors quoted *supra*, and concluded that the majority of them did not favor

---

[1] Effective January 1, 2014, the statute was amended to include an additional factor at 23 Pa.C.S.A. § 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services). Because the parties' petitions to modify were filed prior to the effective date of the subsection, the subsection does not apply to the present case. ***See*** § 6 of Act of December 18, 2013, P.L. 1167, No. 107, effective 1/1/14.

either parent. Trial Court Opinion, 4/14/14, at 5-14. The court indicated that it would not reduce Father's custodial time to the extent Mother desired, explaining that, "[i]f Mother were to receive what she requested in her petition to modify, [F]ather would never know anything about [Child]. She has testified directly that she does not tell him anything, she does not call him when she makes appointments, she does not call him about school issues." *Id.* at 14. The court also stated that it considered 50/50 custody. *Id.* However, the court indicated that it had rejected this proposal due to "the parties' geographic situation." *Id.* The court noted that it considered granting Father primary physical custody as well, but rejected this idea based on the testimony of Dr. Timothy Ring, who performed a custody evaluation and testified at the trial. *Id.* Dr. Ring recommended that Mother should receive primary physical custody of Child, and offered the following explanation.

> [Mother] has a stronger bond with the child. She is more emotionally expressive with the child. The child relates to her. She carries with her personality and her parenting attributes and abilities a greater degree of warmth and nurturance. She communicates well with the child. She knows the child's needs better than [Father]. Again, though, he is an adequate parent and can meet the child's needs quite adequately. But, if we have to make a call here of primary physical custody, it is in favor of mom.

N.T., 4/10-4/11/14, at 298.

Father's first issue is that the trial court abused its discretion by concluding that "neither party was more likely than the other to encourage

and permit the child to have frequent and continuing contact with the other party, pursuant to 23 Pa. C.S.A. § 5328(a)(1)." Father's Brief at 22. The trial court reasoned that this factor did not weigh in favor of either party because "[t]here was mixed evidence regarding this issue." Trial Court Opinion, 4/14/14, at 5. The court observed that Child "has the ability to make nightly telephone calls to the non-custodial parent, which is a good factor," and that "there was testimony that [F]ather has been willing to adjust the custody schedule to accommodate requests made by [M]other." *Id.* However, the court observed that Mother and Father "do not communicate with one another. They often dig their heels into the ground and refuse to act in the child's best interest when it comes to making adjustments to the schedule." *Id.* at 6. In response, Father argues as follows.

> The trial court determined that neither party was more likely to encourage and permit the child to have frequent and continuing contact with the other. The evidence on this issue does not support this determination. The court essentially contradicted itself when it stated: "If Mother were to receive what she requested in her petition to modify, Father would never know anything about [the child]. She has testified directly that she does not tell him anything, she does not call him when she makes appointments, she does not call him about school issues." Father, on the other hand, has consistently requested 50/50 custody since 2009 when custody issues first arose. On the evening when Mother gave birth to another child, she testified that she did not give Father the opportunity to have their child as provided for in the right of first refusal clause of the custody agreement regarding when the parent will not be in care of the child for 72 hours. Furthermore, with regard to taking the child on vacation, Mother testified that she does not *ask* Father for

-10-

permission to take a vacation that cuts into Father's time with the child, but rather *tells* him that she is taking a vacation.

Goodnight phone calls are to be made each night from the child to parent who is currently not with the child. Mother herself testified that this phone call does not always happen when the child is with her. Father testified that the goodnight phone calls coming from [Mother's] residence when the child is with her have been missed several times a year for the last 5 years. Furthermore, Father is owed a significant amount of make-up time with the child as admitted by both Mother and Father.

Father's Brief at 22-23 (citations to the record omitted).

Our review of the record supports the trial court's finding that both parties were equally likely to encourage and permit Child to have frequent and continuing contact with the other party. At the custody trial, Mother testified that she "always make[s] sure that [Child] would see his dad, would talk to his dad." N.T., 4/10-4/11/14, at 54. Mother did not testify that she was seeking additional custodial time as a means of limiting Child's relationship with Father. Rather, Mother stated that she was seeking a change in custody so as to permit her more quality time with Child, to facilitate extracurricular activities, and to lessen the difficulty caused by frequent custody transfers. *Id.* at 14-15, 23-25, 86, 93-94.

Similarly, while Mother admitted that Father was owed makeup time, she testified that this time accumulated for legitimate reasons, such as Child getting sick, or poor weather making transportation difficult. *Id.* at 105-06. Concerning her use of the right of first refusal, Mother testified that that she did not believe that the clause would apply during the birth of her other

child, because she knew that Child would not be out of her care for 72 hours. *Id.* at 46 ("[Child] was out of my direct custody for roughly 55 hours before he went to his father's. . . . I knew exactly how long [Child] was going to be away from my custody."). The trial court was free to accept these explanations. Mother did admit during cross-examination that she does not ask Father for vacation time, but "[h]ow we kind of typically do it is we say this is our intent." *Id.* at 112. However, the court clearly considered the parties' communication problems in reaching its decision, and court was permitted to weigh this testimony as it saw fit.

The record also reflects that Mother has been consistent in ensuring that Child makes his nightly phone call to Father while in Mother's care. While Mother admitted that this phone call was occasionally missed, she explained that there was always a good reason. *Id.* at 52-53, 103. Specifically, Mother indicated that phone calls would be missed when Child was sick, or if there were some other problem that prevented the call from being made. *Id.* Mother indicated that she always informed Father that a call would not be made on a given night, and why. *Id.* at 52-53, 104. Father admitted that Child sometimes failed to make phone calls to Mother while in his care for similar reasons. *Id.* ("I would say that's maybe happened three or four times in those five years. And it could be something as he was sick or we tried a few times and nobody answered."). We discern no abuse of discretion.

Father next claims that the trial court abused its discretion by concluding that "both parties, in term[s] of family and community life, have the ability to provide stability and continuity for the child, pursuant to 23 Pa. C.S.A. § 5328(a)(4)." Father's Brief at 24. The trial court reasoned that this factor did not weigh in favor of either party because "each of the parties is stable in their current relationships." Trial Court Opinion, 4/14/14, at 7. Father argues as follows.

> Mother has three other children besides the child that is subject of this custody dispute, all of whom are under the age of 3, including a newborn. Mother testified that she has "hired a professional nanny service" and that she has a "girl that comes into [her] home to help [her] with the other children." She further testified that she has plenty of extended family members that will help take care of the child. Having to share his Mother with three other, younger, and much needier children will inevitably take a toll on Mother's ability to provide for the child that is the subject of this dispute. The time spent at Mother's house will essentially entail the child being cared for by others. As the court in [**Wiseman v. Wall**, 718 A.2d 844 (Pa. Super. 1998)] stated, it defeats the purpose of awarding much more time to [M]other than [F]ather when most, if not all of the time spent at his Mother's house will be in the care other individuals besides the parent he is to be spending time with. Furthermore, the child specifically told the court in an in camera proceeding that he has no friends at Mother's house. On the other hand, both Father's paramour and the child mentioned a few of the many friends that the child has at his Father's house.

Father's Brief at 25-26 (citations to the record omitted).

As argued by Mother, Father misstates Mother's testimony at the custody trial. **See** Mother's Brief at 25. During the trial, Mother indicated that she was pregnant with her fourth child. The following exchange then took place.

-13-

Q. What, if any, plans have you made to care for your other children while you are in the hospital and recovering from the delivery?

A. Yes. Actually, we hired a professional nanny service. And we have a girl that comes into our home to help me with the other children. That way, I can recover. I have to have a C-section and my C-sections don't typically go very easily. That way, we know we have someone there all the time that can help. And [Mother's second husband, D.,] works from home, so he's home and I am home. And as I said, we have a lot of family. We do have someone that we hired that we know for sure will be there day in and day out.

N.T., 4/10-4/11/14, at 75.

Thus, Mother testified that she had hired a professional nanny service to assist her only during her recovery from pregnancy. Mother did not state that she had hired this nanny to help care for her children indefinitely. Even if Mother's testimony could be interpreted to suggest that hired help would be needed long-term, Father's claim that Mother will be unable to provide appropriate care for Child, and that "[t]he time spent at Mother's house will essentially entail the child being cared for by others" is nothing more than speculation. In addition, while Child indicated that he did not have any friends that live near Mother's residence, Mother testified that she intended to involve Child in various extracurricular activities, which would allow him to meet and socialize with other children. *Id.* at 15-17, 360. Again, the trial court's conclusion is supported by the record.

Father argues next that the trial court abused its discretion by concluding that "Mother had the ability to provide stability and continuity for

-14-

the child, in the physical sense, pursuant to 23 Pa. C.S.A. § 5328(a)(4)."

Father's Brief at 26. Father's argument is in reference to the trial court's

finding that Child's "educational setting" had been disrupted by Mother's

move during December of 2013. Trial Court Opinion, 4/14/14 at 7. Despite

this finding, the court concluded that "stability and continuity in the physical

sense has been provided by [M]other at this point in time." *Id.* Father's

argument is as follows.

> At the age of 7, the child is now in his 3rd school. The most recent school disruption was in January of 2014. This occurred because the Mother moved without permission from the [c]ourt. Mother testified "[w]e just did it. It happened very fast." In his testimony, Dr. Ring stated that he would "like the child to establish some stability in a particular community." Again, the community the child is more involved in is the one in which his Father currently resides as evidence by the testimony and facts above. The ability to gain some stability in both communities, as is currently not the case, is with a 50/50 split of time. Father has consistently requested 50/50 custody and this would satisfy even one of the main concerns of [Mother's] own expert witness.
>
> In his testimony, Dr. Ring stated "given the distance and the lack of communication, their [in]ability to talk to one another, at this point the least amount of transfers with these folks the better." [Father] argues that under the current scheme we have not achieved this goal. The time is neither "equal and fair" as the child had wished, nor have we solved the issue of frequent exchanges and transfers among the parties.

Father's Brief at 26-27 (citations to the record omitted).

Here, Father cannot complain about Mother's decision to move when

Father himself testified that he changed residences during the November

prior to the custody hearing. N.T., 4/10-4/11/14, at 154. Further, while

Father is correct that Dr. Ring expressed concerns about frequent custody

transfers, Dr. Ring also stated that 50/50 custody was inadvisable in the present case. *Id.* at 313-14. Specifically, on cross-examination, Dr. Ring was asked why a 50/50 custody arrangement would not work, even if such the arrangement were to minimize transfers and contact between the parties. *Id.* Dr. Ring offered the following explanation.

> You know, counselor, I keep going back to the relatedness and the warmth and the emotional expression and, again, the connection that the child has with mom and also the necessity for the parties to have to communicate with one another if it were 50/50. You have to discuss activities and continuity of activities and exchange of clothes and who forgot the sneakers and the soccer schedule. These guys aren't there yet.

*Id.*

Additionally, while Dr. Ring indicated that it would be better if Child were to establish stability in a particular community, Dr. Ring recommended unequivocally that it should be Mother's community where Child finds stability. *Id.* at 298. We see no basis on which to conclude that the trial court abused its discretion.

Father's next issue is that the trial court abused its discretion by "failing to consider the well reasoned preference of the child based on the child's maturity and judgment, pursuant to 23 Pa. C.S.A. § 5328(a)(4)." Father's Brief at 27. In its opinion, the trial court acknowledged that Child had expressed a desire that Mother and Father have equal custodial time. Trial Court Opinion, 4/14/14, at 9. However, the trial court appeared to

dismiss the Child's stated preference as a product of Father's influence over

Child.  **Id.**  The court offered the following discussion.

> The court is to consider the well-reasoned preference of the child based upon the child's maturity and judgment.  [Child] has just turned seven.  He is bright.  He is well-mannered.  He was fairly open with the court.
>
> The court found it interesting that he initially told me that he likes the schedule as it is and would make no changes.  He has no concern at either household that he raised with the court, but very late in our conversation he piped up with wanting 50/50 custody, a term that most seven-year-olds would not be aware of.  He told me that he thought equal time with his parents would be fair and that he had talked this over with his father.

**Id.** at 8-9.

In response, Father argues in the following manner.

> As for the well-reasoned preference of the child based on the child's maturity and judgment, the court stated that it "found it interesting the [the child] initially told [the court] that he likes the schedule as it is and would make no changes.  *** but very late in our conversation he piped up with wanting 50/50 custody, a term that most seven-year-olds would not be aware of."  This determination is completely against the weight of the evidence as the court has mistaken the child's testimony.  Despite the [c]ourt's mistake, the child never actually uses the term "50/50."  The in camera testimony was as follows:
>
> Q (the court).  You wouldn't change anything?
> A (the child).  No.  Just the time.
> Q. The time?  What do you mean the time?
> A. Like, I'd like to see them equally.
> Q. Equally.  Why do you think you'd like to see them equally?
> A. Because then it would be fair and right now it's not fair.
> Q. What makes you think it's not fair?
> A. I get to have more time with my dad but my dad doesn't think it.
> Q. Does he have some talks with you about that?
> A. Yeah.

Q. Do you think it's fair the way it is?
A. (Shakes head).
Q. Why don't you think it's fair?
A. Because it's not equal time.

The Child expresses his desire for "equal time" with both parents in the interest of fairness. This testimonial exchange points to two things. First, Mother testified that that the child had been "talking a lot about 50/50 custody which is not a term we use. It is just interesting hearing this little guy come out with 50/50 custody." Had the child in fact been using the term "50/50" as frequently as she states, the child would likely have repeated the same term in the in camera proceeding with the [c]ourt. The child did not. Second, the child states "I get to have more time with my dad but my dad doesn't think it." Clearly, the child has not been unduly influenced by Father, as thought by the [c]ourt. If the child had been influenced, he would not have made such a statement that goes against his Father's perceived "agenda."

Regarding the proximity of the residences of the parties, the court stated "the parties have stipulated that the residences are 22 ½ miles apart in two different counties, which makes it very difficult for the court to practically consider Father's request for 50/50 custody." Father's original request for 50/50 custody was denied by the court "given the parties' geographic situation." At trial, Dr. Ring further testified that the arrangement be kept in its current (on the date of trial) state because "it afford Father about as much contact as he could get without stressing the child regarding the transportation back and forth." Fortunately, the child himself had the ability to express this concern, if it existed, but in fact was quite fine with the transportation as evidence by the following exchange:

Q (the court). Okay and how to do you get to school the next day?
A. We drive to school.
Q. Okay. Is it a long drive?
A. Not really.
Q. Not really?
A. At my mom's house it takes two minutes. At my dad's it takes probably a little longer.

***

- 18 -

> All in all, the child expressed to the court his wish that the time be split between his parents fairly and equally and did not express any wear and tear regarding traveling back and forth from one house to the other.

Father's Brief at 27-29 (citations to the record omitted).

We acknowledge that Father is correct in saying that Child never used the term "50/50" custody during his conversation with the trial court. However, this does not warrant a reversal of the court's custody order. The court did not indicate that Child's purported testimony was a critical factor in its decision to award Mother primary physical custody. The court stated merely that Child's testimony was "interesting." Trial Court Opinion, 4/14/14, at 8-9.

Even if the trial court's incorrect recollection of Child's statements played a significant role in its decision, there was other testimony presented to support the court's inference that Child's preference for shared custody was a product of Father's influence. As noted by Father *supra*, Mother testified that Child had been talking about "50/50 custody," despite Mother's claim that she never used that term or discussed the custody case with Child. N.T., 4/10-4/11/14, at 41-42. The trial court was free to credit this testimony. Additionally, as observed by the trial court, Child stated during his testimony that he had discussed possible custody arrangements with Father. *Id.* at 364. Concerning the second part of Father's argument, it is clear that the portion of testimony quoted by Father relates to the distance traveled for Child to go to school, not the distance between the parties' respective homes. We discern no abuse of discretion.

- 19 -

Next, Father argues that the trial court abused its discretion by concluding that "the parties were equally likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs, pursuant to 23 Pa. C.S.A. § 5328(a)(9)." Father's Brief at 30. The trial court said little with respect to this factor, noting that "[i]t is clear to the court that both parents love [Child]. That is not an issue," and that both parents were "equally blameworthy" for their failure to communicate with and respect one another. Trial Court Opinion, 4/14/14, at 9-10. Father makes the following argument.

> Here, the court heard plenty of testimony regarding the Father's ability to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. Father testified extensively as to the types of loving, stable, consistent and nurturing relationship he has with his son including the activities they do together and Father's strengths as a parent, which includes being patient and understanding and asking his son questions. Father further testifie[d] about the stable and consistent routine they have established at his house for the child which includes basic activities of daily living, eating, going to school, doing homework, eating dinner, going to church, having snacks, spending quality time together, and visiting the child's friends.
>
> When asked whether Father gets baby-sitters when the child is in his custody, the Father answered in the negative and explained that "[i]t is just an understood rule. When we have [the child], it is [the child's] time. We don't make dinner plans. We don't go to parties. When [the child] is here, we have [him]." This expresses Father's dedication to his son and his willingness to devote all of his time, energy, and effort to his son during the time he has him.
>
> Mother, on the other hand, does not express that same dedication. She has three *other* children, all of whom are under the age of 3, including a newborn. Mother testified that she has

- 20 -

"hired a professional nanny service" and that she has a "girl that comes into [her] home to help her with the other children." She further testified that she has plenty of extended family members that will help take care of the child.

Furthermore, Mother has not established that she is able to maintain a nurturing relationship with the child adequate for the child's emotional needs. In his direct testimony, Dr. Ring expressed his opinion that the Mother should be the primary caretaker of the child. He state[d] among other things that "[s]he knows the child's needs better than [Father]." On the contrary, Mother has previously called her child "socially retarded" on a parent evaluation for use by his [p]ediatrician. Thus, the weight of the evidence conveys that Mother does not, in fact, know her child's needs better than [Father]. Dr. R[i]ng's testimony to the contrary should be disregarded.

Father's Brief at 31-32 (citations to the record omitted).

Again, we note that the mere fact that Mother has three other children does not render her incapable of providing a nurturing and loving environment for Child. There is nothing in the record to support such a conclusion. Further, Mother denied during her testimony that she ever called Child "socially retarded." N.T., 4/10-4/11/14, at 124 ("If I said that, that's pretty surprising. That's not something I would normally call my son. I honestly can't think of how that would have come out, because that's pretty sharp."). As noted by Father, Dr. Ring recommended Mother for primary physical custody because he believed her to be more nurturing and loving. *Id.* at 298. Even if Mother did describe Child in a negative fashion, it was not an abuse of discretion for the trial court to weigh this statement against the other evidence presented in Mother's favor.

Father's next argument is that the trial court abused its discretion by concluding that "the parties were equally likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child, pursuant to 23 Pa. C.S.A. § 5328(a)(10)." Father's Brief at 30. The trial court concluded that this factor did not weigh in favor of either party, as "[b]oth parents are likely to and have been able to meet the child's needs." Trial Court Opinion, 4/14/14, at 10. Here, Father repeats his claims that Mother is overwhelmed by caring for several small children, that Child has no friends at Mother's house, and that Child will be ignored if Mother is left with primary custody. Father's Brief at 33-34. For the reasons stated *supra*, no relief is due.

Father next asserts that the trial court abused its discretion by concluding that "the parties were equally able to care for the child, pursuant to 23 Pa. C.S.A. § 5328(a)(12)." Father's Brief at 34. The court noted that it considered this factor but did not indicate that it weighed in favor of either party. **See** Trial Court Opinion, 4/14/14, at 11. Again, Father repeats a number of the arguments raised in connection with his previous issues. Father's Brief at 34-35. Father directs our attention to Mother's request that his custodial time be reduced, points out that Mother changed residences, claims he is owed back time, and alleges that Mother is overwhelmed by her three other children. **Id.** We reject these arguments for the reasons already discussed.

Father claims next that the trial court abused its discretion because it failed "to properly consider Mother's mental condition pursuant to 23 Pa. C.S.A. § 5328(a)(15), and failed in giving weigh[t]ed consideration to this factor as it impacts the safety of the child." Father's Brief at 36. Regarding this factor, the trial court observed that Mother had a "significant" mental health history, and that this history "is an issue." Trial Court Opinion, 4/14/14, at 13. The court suggested, *inter alia*, that Mother's mental health has resulted in poor decision-making "regarding issues of legal custody" and that Mother "needs to find a way to improve things." **Id.** Father argues the following.

> With regard to the history of drug and alcohol abuse of a party or member of a party's household, the court noted a "rather significant past history of Mother that was noted in Dr. Ring's report" but did not thoroughly consider those effects. The court failed to properly consider Mother's mental health as an issue affecting her ability to care for the child. The court found that the "Mother's stress or paranoia *** is largely self-imposed." Further, the court explained that "there are plenty of opportunities for Mother to gain assistance to address this issue; however, she not made good use of those providers." The court further expressed that "Mother would benefit from individual counseling, as some of her behaviors are irrational and *certainly not in the best interests of [the child]*."
>
> According to Dr. Ring's testimony, Mother "carries personality traits that are both histrionic and compulsive. On the histrionic side, histrionic individuals are individuals that get very emotional. They get very reactive and sometimes are subject to episodes of emotional dyscontrol. In other words, in layman's terms, they overreact to situations." Dr. Ring and the [c]ourt have both independently expressed their concerns for the Mother's erratic, dramatic, and compulsive behavior. There was evidence presented regarding a chaotic episode Mother had in the waiting room of the child's doctor's office. Dr. Ring's own

testimony regarding Mother's mental health condition is that she needs to "keep an eye on it."

Father's Brief at 36-37 (citations to the record omitted, emphasis in original).

Critically, we observe that there was no evidence presented at the custody trial that Mother is, or ever was, a danger to Child. In addition, while there was testimony presented that Mother's mental health occasionally caused her to act irrationally, evidence was also presented concerning Father's own fragile emotional state. During the trial, Father was described as resentful, angry, and verbally abusive. For example, Dr. Ring read a portion of a letter, reportedly drafted by Father's mother, during his testimony. N.T., 4/10-4/11/14, at 282. The letter stated that Father was as "an angry individual who got lost in his own self consumption and need to control everything and anyone. The anger has progressed to hate and infused uncontrolled acts of verbal fury. He makes statements to [Mother] and [Child] that seem incomprehensible to me." *Id.* Dr. Ring noted that Father had been estranged from his sisters for 23 years, and expressed disbelief that anything could justify such a lengthy estrangement. *Id.* at 282-83.

Dr. Ring also testified that Father "showed elevations, I believe, on the psycho deviate scale in the MMPI and the paranoia scale in the MMPI." *Id.* at 291. Dr. Ring explained that Father,

> has the qualities of an individual who is unconventional, who has difficulty complying with authority, basically goes through life dancing to the beat of his own drum. Individuals like this we

pay attention to because they need to follow directives. They have a hard time compromising. They are sometimes angry and resentful. And that, in conjunction with the elevation of the paranoia scale, would suggest defensiveness and a great deal of difficulty with criticism, even constructive criticism.

And the bottom line is, those individuals tend to externalize blame onto others for their own deficits. And that's a real difficult quality in an individual's personality. And it sometimes presents a roadblock with regard to growth. If externalize blame onto other people for your deficits, it is hard for you to take a look at what you are doing wrong and fix it.

***

[Father] carries grudges and he's more likely to be resentful and angry. This is a guy that has had a 23-year estrangement with his siblings, doesn't talk to his mother. This is his family. And because he harbors these resentments and carries that for a long time, that speaks to his compromised ability, let's say, to compromise and cooperate.

*Id.* at 291-93.

Father also has engaged in erratic behavior that is not in Child's best interests. For example, Father admitted that, after a previous custody order was entered, he left his job "for a couple of days" and told Child that he was "no longer his father." *Id.* at 234 ("I did turn in my keys to the owner who has been my friend for better than 20 years, and he understood. And yes, there was a conversation that evening where I did make that statement."). Given this evidence, the trial court did not abuse its discretion.

Finally, Father argues that the trial court abused its discretion "in giving weight to the child's bond with Mother, which does not affect the safety of the child, over the other factors, in violation[] of 23 Pa. C.S.A. § 5328." Father's Brief at 37. As noted *supra*, the trial court explained its

decision to maintain primary physical custody with Mother by stating that it was "persuaded by the testimony of Dr. Ring as to the effect" that awarding primary physical custody to Father would have on Child. Trial Court Opinion, 4/14/14, at 14. Father argues as follows.

> Given that Dr. Ring's statement is totally unfounded and does not comply with the applicable standards set forth in the statute and precedent regarding weighing the factors, the court erred in giving weight to the child's bond with the Mother as it does not affect the safety of the child over the other factors.

Father's Brief at 37-38 (emphasis added, citations to the record omitted).

Again, there was no evidence presented at the custody trial that Mother poses, or ever posed, any sort of safety risk to Child. Thus, the trial court was free to credit Dr. Ring's testimony that Child had more of a bond with Mother, and to weigh this evidence as it saw fit. Moreover, while Father claims that Dr. Ring's testimony was "unfounded," Dr. Ring explained in his custody evaluation that his conclusions were "based on a number of clinical interviews, collateral interviews, document review, psychological tests, and behavioral observations with participants in this case," which were described in the evaluation. Custody Evaluation, 3/12/14, at 22. Father does not acknowledge or discuss any of the bases for Dr. Ring's opinion. Thus, Father has failed to establish that he is entitled to relief.

Accordingly, because none of Father's claims entitles him to relief, we affirm the order of the trial court.

Mother's Application for Relief denied.  Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/17/2014